IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,** | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>)<br>) Case No. RWT-09-CV-2573 |
| **FREEMAN,** | )<br>) |
| Defendant. | )<br>) |

## EEOC'S REPLY REGARDING MOTION FOR PROTECTIVE ORDER

Pursuant to the Federal Rule of Civil Procedure 26(c) and 26(b)(2)(C) and Local Rule 105, Plaintiff U.S. Equal Employment Opportunity Commission ("EEOC") files the instant Reply Regarding Motion for Protective Order. For the reasons stated below, EEOC respectfully requests that this Court grant EEOC's Motion and enter an order stating that EEOC is not required to provide a Fed. R. Civ. P. 30(b)(6) designee and to testify regarding the subject matter set forth in Defendant Freeman's Rule 30(b)(6) Notice of Deposition served upon EEOC on March 27, 2012.

### I.  DISCUSSION

Defendant is seeking to exploit the fact that EEOC is both an employer and a regulatory agency that oversees employment practices of private industry. It asserts that what EEOC does with regard to background checks of its own personnel must necessarily be germane to whether Defendant's practices are job-related and consistent with business necessity because EEOC is the agency charged with interpretation and enforcement of Title VII. Defendant also asserts that it should be authorized to take such discovery to support an estoppel defense it has never pleaded. Defendant's arguments are logically and factually flawed.

1.      <u>The OPM suitability process is not an EEOC interpretation of Title VII</u>

First, as Defendant acknowledges, the entirety of its relevancy argument is predicated on the notion that the review of current debt and criminal history information by EEOC security personnel reflects the judgment of the Agency, as the body charged with interpretation of Title VII, concerning what is or is not a lawful employment practice. In its brief, Defendant plainly admits that this is the lynchpin of its relevancy argument. In this regard, Defendant makes the following assertion: "Because of the EEOC's special function and expertise in interpreting antidiscrimination law, its policies and practices regarding the use of criminal and credit information are relevant to whether Freeman's practices are justified by business necessity and compliant with Title VII." CM/ECF Document No. 79 at pg. 4.

Even upon cursory review, Defendant's premise does not withstand scrutiny. The Personnel Security Officer conducts suitability adjudications, including review of delinquent debt and criminal background information, regarding EEOC personnel/applicants. <u>See</u> Exb. 1 at ¶ 4 (Declaration of Felandis Maurice Mosely). He does so as an agent of OPM exercising authority delegated by OPM. <u>See</u> <u>id.</u> at ¶ 1.

The procedures and standards used by EEOC's Personnel Security Officer when reviewing debt and criminal history information are mandated by, and defined by, OPM. <u>See</u> CM/ECF Document No. 70-4 at pgs. 89-90, 129-30, 156; Exb. 1 at ¶ 4 (Declaration of Felandis Maurice Mosely). As OPM regulations clearly state, "Agencies exercising authority under this part by delegation from OPM *must adhere to OPM requirements as stated in this part and OPM's issuances* described in § 731.102(c). *Agencies must also implement policies* and maintain records demonstrating that they employ reasonable methods *to ensure adherence to these OPM issuances*." 5 C.F.R. § 731.103(c) (emphasis added).

2

Moreover, the suitability adjudication function performed by the Personnel Security Officer has nothing to do with any internal assessment of Title VII compliance or offering advice to the public concerning Title VII compliance. It is not within the role or authority of the Personnel Security Officer to assess whether the OPM-mandated procedures and standards comply with Title VII. See Exb. 1 at ¶ 2. The Personnel Security Officer does not receive instruction from anyone at EEOC regarding how he should apply OPM guidelines to suitability adjudications, including whether the OPM standards that he applies to suitability adjudications are, or are not, consistent with Title VII or any other statute enforced by EEOC. See Exb. 1 at ¶ 4. Evaluating compliance with Title VII, or any other statute enforced by EEOC, is not part of the suitability adjudication process delegated to the Personnel Security Officer by OPM. See id. And the Personnel Security Officer is not authorized to speak for EEOC concerning interpretation or enforcement of Title VII or any other statute enforced by EEOC. See id. at ¶ 2. In the event the Personnel Security Officer were ever required by OPM guidelines to make an unfavorable suitability adjudication concerning an EEOC applicant's debt or criminal information (it has not occurred in his four-year tenure), that adjudication would be routed to OPM, not EEOC, for review to ascertain the correctness of his application of OPM background adjudication standards. See id. at ¶¶ 4 & 6.

Granted, as Defendant has stated in its opposition, there have been occasions when the federal courts have accorded deference to EEOC's published policy guidance on the meaning and application of Title VII. See, e.g., Albemarle Paper Co. v. Moody, 422 U.S. 405, 430-31 (1975) (citing Uniform Guidelines on Employee Selection Procedures ("UGESP") at 29 C.F.R. § 1607.4(c) and noting UGESP is entitled to great deference). But that is because those guidance documents are authorized statements of policy intended to provide advice to the public, and they

are published after both (a) extensive study by EEOC staff whose jobs are to formulate guidance for the public and (b) after approval by the Commissioners. The Personnel Security Officer's internal employee adjudications are not such public policy guidance documents. Far from it. Defendant fails to cite to any authority (because there is none) for the proposition that OPM-mandated, internal employment procedures carried out by one individual at EEOC are entitled to any deference by the federal courts, and EEOC certainly does not seek such deference in this or any other case.

As did the Defendant in Kaplan, Defendant Freeman makes much of the fact that EEOC has made OPM-mandated risk level designations for its positions that result in many of those positions falling under debt and criminal history review. But EEOC is required by OPM to make such risk designations, and EEOC must apply the standards/criteria for risk designation set by OPM. See 5 C.F.R. § 731.106(a)-(c) (imposing duty on agencies to make risk level designations for federal positions and discussing designation levels and authority); POSITION DESIGNATION OF NATIONAL SECURITY AND PUBLIC TRUST POSITIONS (available at www.opm.gov/investigate/resources/position/Introduction.aspx) (last visited 5/25/2012) (describing position designation system and stating, "In order to determine the proper designation of a position, the position description and any other necessary supplemental information (e.g. management and security office input) must be carefully evaluated to assess the nature of the position in terms of its clearance requirements or any other impact on national security as well as its impact on the efficiency or integrity of the service. The following four-step process will result in a final designation which, in turn, will dictate the investigative requirements for the position in

question.").[1] OPM also determines the type of investigation that must be conducted if a position is designated at a particular risk level. See id.; 5 C.F.R. § 731.106(c) ("Procedures for determining investigative requirements for all positions based upon risk and sensitivity will be published in OPM issuances.")

As a matter of simple logic, it is untenable to argue that because EEOC follows its duty under federal law to make risk designations for its jobs, and exercises good faith in applying OPM-mandated guidelines to identify the jobs that meet the criteria for a particular risk level, that EEOC is endorsing, as Title VII compliant, the mandatory debt information investigations that are one of the many consequences flowing from those required risk designations. As already discussed, EEOC must make risk designations for its jobs according to OPM standards; the Agency is not free to disregard risk designation standards and definitions because it does not want a position to be subject to a particular type of investigation. See 5 C.F.R. § 731.106. One carries out a legally imposed duty because it is *a legal duty*, not because one agrees with the duty or desires the outcome that results from its performance.

In its opposition, Defendant also appears to assert that EEOC makes ultimate decisions on suitability using debt information supplied in the OPM investigation reports. The assertion is plainly incorrect. As the designee testified, if there ever were to be an unfavorable adjudication (the designee is aware of none), the matter would go to OPM for review to ascertain consistency with OPM guidelines. See CM/ECF Document No. 70-4 at pgs. 82-83; 129-30 ("Q: To whom does your favorable adjudication go? A: OPM. Q: So if you were to make an unfavorable suitability adjudication, does that also go to OPM? A: Yes. Q: And in the event of an unfavorable

---

[1] It is the human resources office at EEOC that oversees risk level designations pursuant to OPM standards. See CM/ECF Document No. 70-4 at pg. 157. Human resources, like any other human resource department, is not external operations. It does not formulate the Commission's policy guidance to the public on Title VII interpretation.

adjudication, what is the OPM's role at that point? A: They actually assess the information to see if what I'm unfavorably adjudicating is supportable.")  Defendant's selective quotation from the EEOC designee's testimony at pages 111-112 is a misleading, but easily rebutted, slight of hand. As the designee stated *immediately after* the testimony quoted by Defendant, the Chief Human Capital Officer at EEOC is involved where an applicant refuses to participate in the investigation of their background and in formulating a plan to address delinquent debts (thereby satisfying their federal employee ethics obligation to try to pay just debts while in the employ of the federal government). See CM/ECF Document No. 70-4 at pgs. 112-113.  As the designee later testified again, EEOC could take action based on failure to participate in the personnel security program by providing information and formulating a plan to meet the OPM ethical requirement to pay debts owed while a federal employee, but "not for debt." Id. at pgs. 190-91.  EEOC does not make unsuitability decisions based on actual the debt information obtained by OPM; it makes the decision based on non-cooperation in the suitability adjudication process.  Id.

Defendant also cites to an EEOC human resource handbook styled, "Personnel Suitability and Security Program Handbook," purportedly to support the proposition that EEOC agrees that indebtedness predicts theft. See CM/ECF Document 79-10 at B-15.  But there are two problems with this argument.  First, as EEOC's designee testified, EEOC *does not review debt information to assess theft risk*. See CM/ECF Document No. 70-4 at pgs. 112-13, 116-17, 138, 140-41, 148-50, 176-77, 190.  In this regard, EEOC did not choose to create this Handbook or its content.  OPM regulations mandate that EEOC create the Handbook. See CM/ECF Document No. 70-4 at pgs. 141-43.  As OPM personnel suitability regulations clearly state, "Agencies exercising authority under this part by delegation from OPM must adhere to OPM requirements as stated in this part and OPM's issuances described in § 731.102(c). Agencies must also implement policies and

maintain records demonstrating that they employ reasonable methods to ensure adherence to these OPM issuances." 5 C.F.R. § 731.103(c). The Handbook is simply an extraction of guidelines mandated by OPM, see CM/ECF Document No. 70-4 at pgs. 19-20, and Defendant's own exhibits show it was copied from OPM adjudication guideline publications, compare CM/ECF Document No. 79-10 at B-15 (referencing indebtedness) with CM/ECF Document No. 79-9 at pg. 23 (same). Thus, the existence of this document demonstrates nothing other than EEOC created a policy handbook containing guidelines mandated by OPM in order to comply with a federal regulation promulgated by OPM.

The point is simply this: Defendant's relevancy argument is based on the meritless concept of EEOC imprimatur. According to Defendant, the fact that EEOC uses an employment procedure (no matter how patently different from Defendant's practices) is significant because EEOC is charged with interpretation and enforcement of Title VII. So, as the argument goes, if EEOC does something, EEOC must believe it is consistent with Title VII. As shown above, Defendant's argument is both illogical and ignores undisputed facts. EEOC did not create OPM personnel suitability requirements, nor does it endorse them. EEOC personnel security officials, acting as agents of OPM, follow OPM requirements because they must. Defendant's argument to the contrary requires one to either ignore reality or apply a concept of Rule 26 relevancy and Rule (b)(2)(C) discoverability that is both virtually limitless in scope and foreign to this jurisdiction.

2. <u>EEOC's Personnel Security Officer reviews debt information for a fundamentally different purpose that is irrelevant to Defendant's affirmative defense</u>

Defendant insists it must have discovery of the suitability adjudication procedure at EEOC because it wishes to explore with a designee (which would again be Mr. Mosely) the basis for very generalized statements in OPM guidelines that Defendant believes support its affirmative defense theory, i.e., that use of credit history information predicts job performance and theft. In this

regard, Defendant quotes from the testimony of EEOC's designee in <u>Kaplan</u> for the proposition that the Agency uses debt information to predict whether an EEOC job applicant will steal. <u>See</u> CM/ECF Document No. 79 at pgs. 6-7.

This is yet another example of Defendant's mischaracterization through selective quotation. In his testimony, EEOC's designee clearly stated that EEOC *does not* use debt information to predict propensity for theft or for any other purpose than to make sure that the applicant will comply with federal ethics regulations mandating that federal employees pay their just debts. <u>See</u> CM/ECF Document No. 70-4 at pgs. 112-13, 116-17, 138, 140-41, 148-50, 176-77, 189-91. <u>See also</u> 5 C.F.R. § 2635.101(b)(12) (federal employee ethics regulation requiring payment of just debts while employed by the government). EEOC does this by requiring applicants to present a plan to pay presently known, delinquent debts while they are in the employ of the federal government. <u>See</u> <u>id.</u>

EEOC does not use debt information to predict future job performance or theft. Therefore, examining an EEOC Rule 30(b)(6) designee for evidence supporting the use of debt information for either of those purposes is not reasonably calculated to lead to discovery of admissible evidence.[2] It is pointless. EEOC can hardly offer justifications for use of credit information to predict theft or job performance if the Agency does neither. Moreover, if Defendant wants to know the basis for statements in OPM-mandated guidelines, it should consult the source. EEOC would not know the basis for statements in the OPM guidelines. While the EEOC Personnel Security Officer must follow OPM guidelines, it is undisputed and beyond cavil

---

[2] In this regard, as shown in EEOC's Motion, it long ago informed Defendant that the Agency is unaware of any government validation studies supporting the employment practices at issue in this case.

8

that EEOC did not formulate those guidelines. This is clearly a circumstance warranting the application of Rule 26(b)(2)(C).

3. <u>Defendant's effort to find debt or criminal history rejections at EEOC to which it can analogize is futile because EEOC is unaware of anyone adjudicated unfavorably for that reason</u>

In the four years of the Personnel Security Officer's tenure (the time period for adjudications within the knowledge of current EEOC personnel) EEOC has never unfavorably adjudicated the background of any applicant because of their delinquent debts or criminal history. See Exb. 1 at ¶ 5 (Declaration of Felandis Maurice Mosely); CM/ECF Document No. 70-4 at pg. 131 (A: "Yes. I've never made an unfavorable adjudication in the EEOC, period. Q: On any grounds; is that correct? A: On any grounds."). This fact is especially significant as it relates to Defendant's request for discovery of EEOC criminal history adjudications. Defendant claims that it seeks to uncover the manner in which EEOC security personnel have adjudicated certain kinds of criminal history information concerning EEOC applicants, the idea being that if EEOC evaluated certain criminal history information in the same way as Defendant, it tends to show, by analogy, that Defendant's practices are lawful. But there is nothing to which Defendant can analogize. Even if such information were otherwise germane to this case, it would only be relevant if EEOC excluded the same type of applicant under similar circumstances as Defendant. But EEOC has not unfavorably adjudicated anyone, regardless of circumstances.

And even if the process used by EEOC security personnel and that used by Freeman were precisely the same, as Defendant has previously argued to the Court *the procedures* used to screen applicants are not legally determinative of whether Defendant's exclusion of particular applicants for criminal history was job-related and consistent with business necessity. In its Second Motion to Compel Answers to Its Second Set of Interrogatories, Defendant argued that EEOC was

incorrect in its position that criminal history unknown to the employer at the time the decision was made to reject a candidate was irrelevant. Defendant asserted that the question of job-relatedness and business necessity depends on whether a candidate was, in-fact, a risk, regardless of what its procedures did or did not uncover about a candidate at the time. Defendant took the following position:

> First, the post-rejection and pre-rejection criminal activity of an applicant turned down due to prior criminal convictions may well be relevant to Freeman's claim that the applicant was too great a risk to be hired. *The validity of decisions not to hire applicants due to criminal convictions is evaluated on all evidence presented at trial, not just on evidence known to the employer at the time of the decision.* As the Third Circuit held in *El* v. *Southeastern Pennsylvania Transportation Authority*, 479 F.3d 232, 248 (3d Cir. 2007), Title VII requires only that "an employer be able to show that its policy is consistent with business necessity when challenged." *Thus, a criminal conviction screening policy with a disparate impact will be upheld if the employer shows that it "accurately screened out applicants too likely to commit" certain offenses. Id. This is true even if the employer had "no real basis" for believing that its policy accurately screened applicants*. Id.

CM/ECF Document No. 53-2 at pgs. 9-10 (emphasis added). Defendant received the benefit of this representation to the Court, i.e., an order of this Court directing EEOC to provide certain responsive information. The doctrine of judicial estoppel requires that it now be barred from asserting the opposite position.

The case law cited by Defendant is in accord. "Title VII, however, does not measure care in formulating hiring policies; rather, it requires that an employer be able to show that its policy is consistent with business necessity when challenged. Granted, the two will typically go hand-in-hand. Here, however, for all of SEPTA's apparent loose manner in formulating and defending its policy, it produced credible expert testimony that its policy accurately screened out applicants too likely to commit acts of violence against paratransit passengers." El v. Southeastern Penn. Trans. Auth., 479 F.3d 232, 248 (3d Cir. 2007).

10

Either the applicants Defendant excluded from employment due to criminal history in-fact posed a substantial risk to Defendant and its customers or they did not. This is an objective question. A very good process for evaluating a candidate's criminal justice history will not insulate Defendant from liability if the candidates it excluded did not, in-fact, pose a substantial risk to Defendant, and a very bad evaluation process will not cause Defendant to incur liability if the candidates it excluded did pose a substantial risk. In other words, the job-relatedness and business necessity question are objective and outcome-based, so discovery of EEOC's process — where there have been no actual exclusions of candidates for criminal history at EEOC — is not reasonably calculated to lead to discovery of admissible evidence. There are no analogous candidates rejected by EEOC, so there is nothing to which Defendant may compare its decisions. This is discovery for the sake of curiosity and to punish EEOC for having the temerity to enforce the law, not for the purpose of generating admissible evidence.

Defendant essentially acknowledges that it wishes to examine an EEOC designee (which would be Mr. Mosely again) concerning his evaluation of criminal history information of particular candidates for employment at EEOC, though it denies wanting to know the candidates' names. See CM/ECF Document No. 79 at pgs. 10, 21 ("The EEOC's use of [the factors in 5 C.F.R. § 731.202(c)] reveals, for example, the EEOC's views on the nature and seriousness of a particular type of criminal offense."). But as discussed, there have been no unfavorable adjudications at EEOC due to criminal history information. More importantly, the subjective judgments made by a single Personnel Security Officer at EEOC – working as an agent of OPM and applying OPM standards – concerning the reasons that particular individuals did not pose a risk to EEOC cannot reasonably be construed as reflective of how EEOC as an Agency interprets Title VII or views job-

11

relatedness and business necessity in disparate impact cases. Moreover, it is likely that such an inquiry would violate the Privacy Act of 1974.

Of course, Defendant's argument assumes that EEOC's views are somehow relevant to whether Defendant violated with the law (a rather novel position for a defendant-employer to take in EEOC-initiated litigation).[3] But it is the province of this Court – not the EEOC – to discern the law that applies to this particular litigation and to find the facts. EEOC is a party to this litigation, and it will advocate its position on both matters, as will the Defendant. However, the opinion of a single employee at EEOC who is not tasked with interpreting or enforcing Title VII is hardly relevant to the Court's inquiry. The applicable law is what it is, and whether Defendant violated that law depends on what it did, not what the EEOC does internally (and entirely outside of Defendant's knowledge) concerning EEOC employees.

4.   <u>Defendant's attempt to explain away the weight of authority barring the type of discovery it seeks is meritless</u>

The cases that Defendant cites in support of its argument are unpersuasive, as are its attempts to distinguish cases cited by EEOC.

Defendant cites <u>EEOC v. Bloomberg L.P.</u>, No. 07 Civ. 8383(LAP), 2010 WL 3260150 (S.D.N.Y., Aug. 4, 2010), but note that Bloomberg was a disparate treatment case under Title VII where punitive damages were sought, <u>see</u> CM/ECF Document No. 1 in <u>EEOC v. Bloomberg, L.P.</u>,

---

[3] Defendant admits it seeks this discovery to look for similarities to EEOC internal practices for purpose of arguing those practices tend to show it has complied with the law. Presumably, then, Defendant would also concede that to the extent (a) Defendant has rejected candidates for criminal or credit history information with circumstances comparable to persons who passed EEOC's suitability adjudication, or (b) Defendant's policies and practices regarding such information deviate from those used by the EEOC Security Officer, that fact would be relevant evidence that Defendant has violated the law. So, for instance, as reflected in the <u>Kaplan</u> testimony the fact that EEOC does not look at debt information for the purpose of predicting job performance or theft would be probative of the fact that Defendant's admitted use of credit history for those purposes violates Title VII. Defendant cannot have it both ways, and if it is unwilling to make such a concession, that fact speaks volumes about its argument.

No. 07 Civ. 8383(LAP) (S.D.N.Y.) (available on PACER), and the court stated in its order that it was permitting such discovery because it deemed the discovery relevant to "whether Bloomberg *should have viewed* Bloomberg's own practices *as Title VII compliant*." Id. at *3 (emphasis added). This suggests discovery on the reckless indifference and good faith efforts to comply with law questions that are determinative of punitive damages under 42 U.S.C. Sec. 1981a(b)(1) and Kolstad v. American Dental Ass'n, 527 U.S. 526 (1999). The present case involves a disparate impact claim, where punitive damages are neither sought nor available.

Defendant also cites to the second discovery decision in Kaplan Higher Education Corp. as further support for its position. See CM/ECF Document No. 79-13. In that case, the district court ordered EEOC to produce yet another Rule 30(b)(6) designee to testify concerning the arcane, complex world of OPM risk level designations as applied to each of 95 different job titles at EEOC, many of which have no parallel in the private sector. Apparently, the court relied on the theory that if EEOC carries out its affirmative legal duty to sort its jobs by risk level applying OPM-mandated risk level criteria, this shows that (a) EEOC as an agency officially believes that credit checks for those jobs are good and comply with Title VII and (b) that the opinions of EEOC's human resources office, which is responsible for designations, represent the official position of the Agency concerning interpretation of Title VII disparate impact cases. Such a conclusion is simply illogical, and if anything, this second Kaplan decision confirms the error of the first Kaplan decision by illustrating both the weakness of the argument and how far astray that court's rationale would take the discovery in this case. That case has now become an expansive, *de novo* review of EEOC's human resource function, to no legitimate or useful end.

Defendant's effort to distinguish numerous cases cited by EEOC is also meritless. Defendant asserts that U.S. v. New York Metropolitan Trans. Auth., No. CV 2004-4237

13

(SLT)(MDG), 2006 WL 708672 (E.D.N.Y., Jan. 12, 2006), is distinguishable because it involves DOJ, not EEOC. This distinction is entirely irrelevant. Both EEOC and DOJ are tasked with enforcement of Title VII, <u>see generally</u> 42 U.S.C. §§ 2000e-5 & 2000e-6, and both have issued guidance regarding Title VII, <u>see generally</u> 29 C.F.R. Part 1607 (Uniform Guidelines on Employee Selection Procedures).

Defendant also tries to distinguish both <u>New York Metropolitan Trans. Auth.</u> and <u>EEOC v. JBS USA, LLC</u>, No. 8:10CV318, 2012 WL 169981 (D. Neb., Jan. 19, 2012) based on the fact that those cases involved religious accommodations, which entail an individualized analysis of the circumstances of particular employers and employees. But in a disparate impact case under Title VII, job-relatedness and business necessity also turn on *the particular facts of a given employer, each particular job title, and the specific duties, work setting, and conditions of work of each job title*. "[T]he challenged practice [must be] job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(i); <u>Albemarle Paper Co. v. Moody</u>, 422 U.S. 405, 430-31 (1975); <u>Griggs v. Duke Power Co.</u>, 401 U.S. 424, 431 (1971). And regarding convictions, the case law is in agreement that Defendant will have to make this showing based on facts related to particular candidates or, at a minimum, categories of candidates. <u>See, e.g.</u>, <u>Green v. Missouri Pacific Rail. Co.</u>, 523 F.2d 1290, 1297-99 (8th Cir. 1975) (rejecting blanket no-conviction policies, requiring nexus between conviction and performance of job, and analyzing circumstances of plaintiff's conviction, his subsequent employment history, and defense expert's opinion supporting individualized review of applicants); <u>El v. Southeastern Penn. Trans. Auth.</u>, 479 F.3d 232, 243-46 (3d Cir. 2007) (declining to hold that employer must always consider individual circumstances of each applicant, but announcing rule that a categorical criminal history policy must still accurately distinguish between persons who do or do not pose an unacceptable

risk and analyzing recidivism evidence for violent crime, the duties of paratransit driver job at issue, the workplace setting and conditions, and special vulnerabilities of disabled paratransit customers).

Defendant also seeks to distinguish United States ex rel. Singh v. Bradford Regional Medical Ctr., 249 F.R.D. 220 (W.D. Pa. 2008), and MCI Worldcom Network Svs., Inc. v. Von Behren Elec., Inc., No. Civ. A. 1:00CV3311JTC, 2002 WL 32166535 (N.D. Ga., May 21, 2002), cases that denied discovery of the plaintiffs' practices on the ground that they were private litigation, not discovery of a government plaintiff charged with enforcing the law at issue in the case. In so doing, Defendant again exposes the essence of its relevancy argument, i.e., that suitability procedures that EEOC is required to implement are purportedly relevant because they somehow reflect the official position of the Agency. But as discussed above, the facts show that they do not represent an interpretation of Title VII by EEOC. And given that fact, Defendant's private-public distinction is immaterial.

5.  The position Defendant seeks to induce this Court into adopting will undermine federal regulatory agency enforcement actions while not advancing the merits of such litigation

The reason why the cases EEOC cites present the better view is readily apparent. If Defendant's argument were to be accepted by this Court – that internal employment practices at EEOC are discoverable because they reflect the judgment of the Agency about what is lawful or unlawful (notwithstanding all evidence to the contrary) – then EEOC's employment practices will be discoverable in *almost every* case for one purpose or another. Defendant's argument has almost limitless applications for employer-defendants in these cases. To start, EEOC will have to produce a Rule 30(b)(6) designee in every criminal or credit background check case it brings, and the rationale Defendant seeks to induce this Court into adopting would not be limited to

15

background check cases.  Virtually every EEOC-initiated lawsuit will become a dual-track inquiry into both the defendants' practices and EEOC's employment practices.

For example, under Defendant's rationale, in a sexual or racial harassment case where EEOC challenges the sufficiency and reasonableness of employer's anti-harassment policy, training, and complaint procedures under the Faragher/Ellerth decisions and their progeny, EEOC's own harassment policies, training, and complaint procedures would be discoverable.  If EEOC challenges an employer's promotional practices as being subjective and overly discretionary leading to promotional decisions infected with prejudice and implicit bias, EEOC's own promotional practices would be subject to discovery.  Where EEOC challenges failure to provide reasonable accommodation under the Americans With Disabilities Act, EEOC's own procedures for receiving and assessing reasonable accommodation requests from its own employees, its judgment as to what constituted a reasonable accommodation for an Agency employee or an undue hardship for EEOC, and its evaluation of whether was disabled and therefore legally eligible for accommodation would all become discoverable.  If an employer asserts a charge is untimely and EEOC argues the period for filing should be equitably tolled, the employer could seek discovery of when and under what conditions EEOC has deemed an internal EEO complaint filed by one of its own employees to be equitably tolled under federal sector Title VII regulations (which also impose time limits for complaint filing).  The examples of how the argument could be applied to distract or derail EEOC enforcement efforts are legion.  Indeed, as Defendant freely acknowledges, we have already seen its rationale applied by one district court in an EEOC case brought under the Pregnancy Discrimination Act where that court went so far as to authorize a discovery inquiry into whether EEOC provides lactation rooms for its own employees.

See EEOC v. Bloomberg L.P., No. 07 Civ. 8383(LAP), 2010 WL 3260150, at *3 (S.D.N.Y., Aug. 4, 2010). This cannot be the correct result.

Defendant's rationale would also readily authorize irrelevant discovery into the practices of other federal agencies that are regulated by the statutes that they enforce. For instance, when DOJ files an action to enforce Title VII, such as bringing testing discrimination cases that apply standards contained in the Uniform Guidelines on Employee Selection Practices, see generally 29 C.F.R. Part 1607 – which are regulations jointly promulgated by DOJ, EEOC and other agencies and govern employee selection procedures – DOJ's own compliance with those standards would become discoverable. When DOJ enforces the Uniformed Services Employment and Reemployment Rights Act (USERRA), its manner of handling reemployment by its own employee-veterans would be discoverable. In U.S. Department of Labor litigation to enforce standards of OSHA or the Fair Labor Standards Act, the way DOL interprets and applies worker safety and wage and hour rules to its own employees would presumably become discoverable. In an enforcement action brought by the Securities and Exchange Commission challenging whether a regulated entity used proper accounting methods, a court could authorize an inquiry into the accounting methods customarily used by SEC finance personnel. In sum, Defendant's rationale provides a convenient mechanism for delaying and undermining federal regulatory agency enforcement actions. This, in addition to a lack of basic relevancy, is the crux of the problem, and this is also a prime illustration of why the Supreme Court has cautioned that the federal courts must draw clear distinctions between the role of government as market participant and the role of government as regulator. See Director, Office of Workers' Compensation Programs, DOL v. Newport News Shipbuilding and Dry Dock Co., 514 U.S. 122, 128 (1995) ("[T]he status of the

Government as a . . . market participant must be sharply distinguished from the status of the Government as regulator or administrator.")

While the facts plainly show the contrary, let's assume for a moment that OPM requires EEOC security personnel to do precisely what Defendant does with credit and criminal history information and to unfavorably adjudicate precisely the same kind of candidates with exactly the same background information as Defendant has rejected.  Indeed, what if EEOC were to enter into a stipulation to that effect for purposes of this litigation?  Where does that get us?  In that instance, EEOC's own practice would be just as illegal as Defendant's practice.  "It is no excuse for a[n] . . . employer to point to other public sector employers on the local, state, or national level and complain of equally discriminatory policies and practices . . . ." U.S. v. State of New York, 475 F. Supp. 1103, 1109 (N.D.N.Y. 1979).  And it would be for this Court, not EEOC, to independently determine the legality of that common practice for purposes of this litigation.  The Court would still have to conduct exactly the same inquiry of Defendant's practices and apply precisely the same law as it would had there been no stipulation at all, and the mere fact that OPM, hypothetically, mandates the same practice internally would be entitled to no deference or weight. An Agency personnel practice is not presumptively lawful, nor is it an Agency pronouncement to the public that represents guidance on how to comply with the law.  It is an internal personnel action and nothing more.

6.      <u>Defendant's argument for discovery based on a non-existent estoppel defense is meritless</u>

Defendant persists in arguing that discovery of the suitability adjudication process as it operates at EEOC is relevant because if EEOC does what Freeman does that fact may establish estoppel.  Defendant's argument is disingenuous and legally unsupportable for several reasons. First, as already stated in EEOC Motion and reflected in the cases cited therein, estoppel requires a

18

showing of objectively reasonable, detrimental reliance by the party invoking equity. It also requires a showing of a misrepresentation of fact. Even the case law Defendant cites requires these elements. See Jeziorski v. INS, 990 F.2d 1258, 1993 WL 94714, at *1 & n.1 (9th Cir., Apr. 1, 1993).

Defendant has not produced any evidence to EEOC or made any allegation in its Answer or briefs that it somehow relied on EEOC's OPM suitability process, nor could it, because it did not know what those procedures were until the Kaplan deposition. Nor can those procedures be said to be a representation of fact to Defendant, let alone a misrepresentation. More importantly, Defendant has not pleaded the affirmative defense of estoppel. The concept of relevancy under Rule 26 discovery is always tethered to the claims and defenses actually set forth in the pleadings. Whether or not Defendant could ever amend its Answer under Rule 15 to include estoppel, Rule 15 does not authorize discovery of affirmative defenses that have not been pleaded.

## II. CONCLUSION

For the foregoing reasons, Plaintiff EEOC respectfully requests that this Court grant its Motion for Protective Order and enter an Order stating that EEOC is not required to give deposition testimony regarding the subject matter set forth in Defendant's Notice of Rule 30(b)(6) Deposition.

Respectfully submitted,

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION

_____/s/_____
RONALD L. PHILLIPS
Supervisory Trial Attorney
EEOC-Baltimore Field Office
City Crescent Building, 3rd Floor
10 South Howard Street
Baltimore, Maryland 21201

                                        Telephone number: (410) 209-2737
                                        Facsimile number: (410) 962-4270