**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

|  |  |  |
|---|---|---|
| | * | |
| **EQUAL EMPLOYMENT** | * | |
| **OPPORTUNITY COMMISSION,** | * | |
| | * | |
| Plaintiff, | * | |
| | * | Case No.: RWT 09cv2573 |
| v. | * | |
| | * | |
| **FREEMAN,** | * | |
| | * | |
| Defendant. | * | |
| | * | |

**<u>MEMORANDUM OPINION</u>**

World-renowned poker expert Kenny Rogers once sagely advised, "You've got to to know when to hold 'em.  Know when to fold 'em.  Know when to walk away."[1]  In the Title VII context, the plaintiff who wishes to avoid paying a defendant's attorneys' fees must fold 'em once its case becomes so groundless that continuing to litigate is unreasonable, i.e. once it is clear it cannot have a winning hand.   In this case, once Defendant Freeman revealed the inexplicably shoddy work of the EEOC's expert witness in its motion to exclude that expert, it was obvious Freeman held a royal flush, while the EEOC held nothing.  Yet, instead of folding, the EEOC went all in and defended its expert through extensive briefing in this Court and on appeal.  Like the unwise gambler, it did so at its peril.  Because the EEOC insisted on playing a hand it could not win, it is liable for Freeman's reasonable attorneys' fees.

---

[1] Kenny Rogers, The Gambler (United Artists 1978).

# BACKGROUND

## I.    Facts[2]

Freeman, as a regular part of its hiring process, conducted criminal background checks on all applicants who were offered a position, and conducted credit background checks on applicants who were offered financially sensitive positions.[3] *EEOC v. Freeman*, 961 F. Supp. 2d 783, 787 (D. Md. 2013).    Importantly, applicants were not turned away for *any* negative information.    Rather, Freeman limited in scope the type of negative information that would disqualify an applicant.    For example, as to the criminal background check, Freeman generally did not consider arrests, but only convictions that had occurred within the past seven years.[4]    *Id.* at 788.    Furthermore, Freeman did not consider *all* convictions, but only those for certain crimes. *Id.*    Similarly, with regard to credit checks, only certain negative items would exclude an applicant from being hired.    *Id.* at 789.    The Equal Employment Opportunity Commission (the "EEOC") alleged that Freeman's use of background checks was discriminatory.    *Id.* at 790.

## II.    Procedural History

After being rejected by Freeman based on information in her credit report, Katrina Vaughn filed a charge of discrimination with the EEOC.    *Id.* at 789.    Based on this charge, the EEOC filed a complaint in this Court alleging that Freeman's use of background checks had a disparate impact on African-American, Hispanic, and male job applicants.    *Id.*    On April 27, 2010, the Court dismissed all claims relating to hiring decisions made before March 23, 2007, the date 300 days before the original charge of discrimination was filed on

---

[2] The facts of this case are set out in full in the Court's previous opinion disposing of this case on the merits. *EEOC v. Freeman*, 961 F. Supp. 2d 783, 787-89 (D. Md. 2013). This Opinion will state only those facts particularly relevant to Freeman's motion.
[3] Freeman stopped conducting credit checks in 2011. *Id.* at 787n.2.
[4] Arrests were only considered to the extent that, if a background check turned up an outstanding arrest warrant, the applicant was afforded an opportunity to have the warrant withdrawn. *Id.* at 788.

January 17, 2008.  ECF No. 19.  On January 31, 2011, the Court granted Freeman's partial motion for summary judgment and dismissed all claims relating to hiring decisions based on criminal background checks made prior to November 30, 2007, the date 300 days before September 25, 2008, when the EEOC first notified Freeman that it was expanding its investigation to include race discrimination based on the use of criminal background checks. ECF No. 43.  On August 24, 2012, the EEOC voluntary dismissed with prejudice its claim that Freeman unlawfully discriminated against Hispanics.[5]  ECF No. 95.

On July 18, 2012, the EEOC served Freeman with the expert report of Dr. Kevin R. Murphy.  ECF No. 186 at 9.  After Freeman pointed out various errors in the report, the EEOC served a second expert report that purported to fix those errors on July 26, 2012.[6] ECF No. 186-17.  On December 18, 2012, Freeman moved to exclude Dr. Murphy's report and the report of a second expert, Dr. Beth Huebner, arguing that a significant number of errors and omissions within the reports made them unreliable, and thus inadmissible.[7]  ECF No. 108.  On December 21, 2012, Freeman moved for summary judgment, arguing that, without reliable statistical evidence of a disparate impact, the EEOC could not make out a *prima facie* case of discrimination.  ECF No. 114.  The EEOC responded to each motion.  ECF Nos. 121, 126.  In its opposition to the motion to exclude the expert reports, the EEOC submitted a supplemental expert report from Murphy that purported to moot Freeman's criticisms.  ECF No. 121 at 7.  The EEOC also contended that Freeman was the source of any errors in the expert report.  *Id.* at 13.

---

[5] This was apparently because the EEOC's experts could not find a disparate impact on Hispanics.  *Freeman*, 961 F. Supp. 2d at 798-99.

[6] This second report only fixed minor clerical errors.  ECF No. 186-16.  For convenience, the July 18, 2012 and July 26, 2012 reports will be referred to interchangeably as the "initial report."

[7] Dr. Huebner's report purported to replicate the findings of Dr. Murphy, and focused largely on general population statistics regarding minorities and the criminal justice system.  This Opinion will focus primarily on Dr. Murphy's report.

The EEOC also proffered yet another report by Murphy at the motions hearing on June 19, 2013. *Freeman*, 961 F. Supp. 2d at 797.

On August 9, 2013, the Court excluded the EEOC's experts and granted Freeman's motion for summary judgment. ECF No. 150. Freeman subsequently moved for attorneys' fees. ECF No. 154. After filing its appeal, ECF No. 166, the EEOC moved to stay proceedings related to Freeman's motion for attorneys' fees. ECF No. 172. The Court granted that motion over Freeman's opposition. ECF No. 176. The EEOC also moved to amend the record for appeal with Murphy's report tendered at the motions hearing, ECF No. 177, and the Court granted that motion, again over Freeman's opposition. ECF No. 181.

The Fourth Circuit affirmed the Court on February 20, 2015. *EEOC v. Freeman*, 778 F.3d 463 (4th Cir. 2015). Freeman submitted a renewed motion for attorneys' fees that included those fees incurred on appeal, ECF No. 186, and has further supplemented its request to account for fees incurred defending its fee request. ECF No. 197.

## ANALYSIS

The EEOC has, understandably, taken a keen interest in employers' use of background checks to make hiring decisions.[8] "Because of the higher rate of incarceration of African-Americans than Caucasians, indiscriminate use of criminal history information might have the predictable result of excluding African-Americans at a higher rate than Caucasians." *Freeman*, 961 F. Supp. 2d at 786. Similarly, because blacks typically fare worse in many indicators of economic health, such as income and poverty rate, than whites, credit checks may disproportionately exclude blacks. The EEOC is certainly entitled to attempt to police the use of background checks through litigation, and to attempt to use litigation to challenge whether an

---

[8] *See* Scott Thurm, *Employment Checks Fuel Race Complaints,* Wall St. J., June 12, 2013, at A1, *available online at* http://www.wsj.com/articles/SB10001424127887323495604578539283518855020

employer's use of background checks is "job-related for the position in question and consistent with business necessity." *Id.* at 791.

However, before the EEOC can get to the question of business necessity, it must actually make out a *prima facie* case of disparate impact, and before it can make out a *prima facie* case of disparate impact, it must actually produce reliable statistical evidence showing that a particular employment practice has a disparate impact on a protected class. *Id.* at 791. The EEOC is *not* entitled to require an employer to demonstrate business necessity when it is consistently unable to produce any reliable evidence of a disparate impact. *See EEOC v. Propak Logistics, Inc.*, 746 F.3d 145, 157 (4th Cir. 2014) ("The reference to statutory goals and missions, however, cannot be divorced from the manner in which those purposes are implemented.") (Wilkinson, J., concurring). Continuing to litigate once the faults in the EEOC's case were laid bare was unreasonable, and Freeman is entitled to reasonable attorneys' fees from that point forward.

## I.     The Availability of Attorneys' Fees Under Title VII

Title VII provides that "the court, in its discretion, may allow the prevailing party…a reasonable attorney's fee (including expert fees) as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person." 42 U.S.C. § 2000e-5(k). By its terms, this provision allows either a prevailing plaintiff or a prevailing defendant to recover attorneys' fees. However, the award of attorneys' fees to a prevailing plaintiff involves different considerations than an award to a prevailing defendant. The prevailing plaintiff is acting as a "private attorney general" in vindicating an important federal interest against a violator of federal law, and therefore "ordinarily is to be awarded attorney's fees in all but special circumstances." *Christianburg Garment Co. v. EEOC*, 434 U.S. 412, 416-17 (1978). The opposite is true of a prevailing defendant. A prevailing defendant not only is not vindicating any important federal

interest, but the award of attorneys' fees to prevailing defendants as a matter of course would undermine that interest by making it riskier for "private attorney generals" to bring claims.[9] *Id.* at 422. Accordingly, before a prevailing defendant may be awarded fees, it must demonstrate that a plaintiff's claim was "frivolous, unreasonable, or groundless, or that the plaintiff continued to litigate after it clearly became so." *Id.* Importantly, however, this standard does not require a plaintiff to have acted in bad faith. *Id.* at 421*; see also Arnold v. Burger King Corp.*, 719 F.2d 63, 66 (4th Cir. 1983) ("A plaintiff acting in good faith may nevertheless be assessed fees if his claim is groundless or frivolous").

In assessing whether to assess attorneys' fees against a plaintiff, it is important that a court not engage in minute, *post hoc* questioning of a plaintiff's claims and conduct in light of plaintiff's failure on the merits. *EEOC v. Great Steaks, Inc.*, 667 F.3d 510, 517 (4th Cir. 2012). However, there is "neither a precise test to be used, nor a specific quantum of proof required, in determining whether a plaintiff's claim was unreasonable." *Propak Logistics*, 746 F.3d at 151. A decision to award fees is committed to the discretion of the Court, which is in the best position to assess the considerations relevant to the conduct of litigation. *Id.*

## II. Freeman is Entitled to Reasonable Attorneys' Fees

### A. The EEOC Needed to Present Reliable Statistical Evidence that Freeman's Policies had a Disparate Impact to Make Out a *Prima Facie* Case of Discrimination

It is black letter Title VII law that, in order to make out a *prima facie* case of disparate impact, a plaintiff must present "reliable and accurate statistical analysis performed by a qualified expert." *Freeman*, 961 F. Supp. 2d at 786. This evidence is necessary because a

---

[9] The Court notes that, since it is not awarding attorneys' fees from the inception of this litigation, an award of attorneys' fees here cannot be fairly said to reduce incentives to *bring* claims. No one has argued that it was unreasonable for the EEOC to bring this lawsuit, and the award of attorneys' fees here should not be construed as an implication that it was.

disparate impact claim alleges that an otherwise neutral policy has a negative effect on the ability of a protected group to get hired.  Accordingly, there *must* be a statistical disparity "between the number of protected class members in the qualified applicant group and those in the relevant segment of the work-force."  *Id.* at 791.

Simply reciting this black letter law meets several of the EEOC's arguments in its opposition to an award of attorneys' fees.  First, the EEOC asserts that its case is not factually groundless.  ECF No. 191 at 5.  The basis for this argument appears to be that it *may* have been possible for the EEOC to show evidence of a disparate impact, and it just so happened to fail here.  *Id.* at 5-7.  But the possible existence of evidence somewhere to back up a claim does not constitute reasonable grounds for continuing to litigate that claim.  Cases are litigated based on evidence actually produced, not hunches, however reasonable those hunches may be.  Without reliable statistical evidence produced by an expert, which is entirely absent here, the EEOC simply could not make out its *prima facie* case.  The factual lack of reliable expert testimony showing a disparate impact was fatal to the EEOC's disparate impact claim in *this particular case*, even if in some alternate universe (or simply by hiring a better expert), the EEOC could have made out a claim.

The EEOC also could not reasonably rely on general population statistics to make out its *prima facie* case.  It is true that, in some circumstances, general population statistics will suffice to show that a particular policy has a disparate impact.  *See Griggs v. Duke Power Co.*, 401 U.S. 424, 430-32 (1971).  However, an examination of *Griggs*, the first Title VII disparate impact case, puts the folly to the EEOC's argument that it could have done so here.  In *Griggs*, an employer had a facially neutral requirement that an applicant be a high school graduate.  *Id.* at 427-28.  The Supreme Court reversed the district court's dismissal of the complaint, reasoning

that, despite the lack of discriminatory intent, the fact that African-Americans had lower high school graduation rates in the employer's state meant that the policy had a discriminatory impact, and that Title VII allowed such claims.  *Id.* at 429-32.  The difference between *Griggs* and this case is obvious.  In *Griggs*, the challenged policy, a high school graduation requirement, and the general population statistic, high school graduation rates, were the *exact same*.  *Griggs* simply does not apply to a case where the challenged policy is not congruent with the general population statistic being offered as proof of a disparate impact.

In addition to *Griggs*, the EEOC cites several cases for the proposition that "[l]ower federal courts have also accepted external population proof in a variety of contexts despite arguments that they did not perfectly match the facts of the case."  ECF No. 191 at 10.  An examination of each of these cases reveals that none supports this argument, even by analogy.

In *Peightal v. Metropolitan Dade County*, 26 F.3d 1545 (11th Cir. 1994), a white applicant challenged, on equal protection grounds, a fire department's affirmative action policies. The Eleventh Circuit noted that, for a government employer to show a compelling interest in combating discrimination that would justify using affirmative action, "statistical comparisons between the employer's work force and the composition of the relevant population are probative of a pattern of discrimination."  *Id.* at 1553.  The Eleventh Circuit did allow the defendant fire department to present statistical disparities between the general relevant population of Hispanics and the number of Hispanics who passed a qualifications exam, notwithstanding that those statistics did not account for supposed disparities in graduation rates for Hispanics, graduation from high school being a prerequisite to take the exam.  *Id.* at 1556n.17.  It accepted this statistic, however, because (a) it determined that the relevant statistical refinement was not available, as there was no data on Hispanic high school graduation rates in the area, and (b) the plaintiff had

not shown beyond speculation that it would matter. *Id.* Moreover, the Eleventh Circuit also noted the numerous refinements the fire department *had* made to ensure that the external population statistics reasonably matched the relevant applicant pool. *Id.* at 1553-57. In fact, the case had previously been remanded for those refinements precisely because of "the relative undesirability of general population figures." *Id.* at 1554.

In *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1197 (10th Cir. 2006), the Tenth Circuit noted that "the population selected for statistical analysis need not perfectly match the pool of qualified persons." However, the EEOC could not have reasonably relied on that case. First, the plaintiff's expert in that case did attempt to set out a specific methodology for constructing a representative sample which, as explained below, the EEOC's expert here never did. *Id.* at 1194-95 (describing expert's process for defining similarly situated employees and measuring the appropriate statistics to determine disparate impact). Moreover, in that case, the Tenth Circuit *still determined that the expert's conclusions were unreliable. Id.* at 1198-99. It is curious that the EEOC would rely on a case that is directly contrary to its position to support the notion that its position was legally reasonable.

The cases cited by the EEOC to support the reasonableness of its reliance on general population statistics are simply inapplicable. They support the proposition that general population statistics will be allowed where those statistics are completely congruent with an employment criteria, as in *Griggs*, or where a limited number of data points, in an otherwise refined sample, do not perfectly align with the general population data. The cases do not support the proposition that a plaintiff is entitled to rely on general population statistics divorced from any reference to the defendant's employment practices without any attempt to control for those practices.

It has been clear since at least 1989, when the Supreme Court decided *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642 (1989), that refined, statistical comparisons are necessary to make out a disparate impact claim. *Id.* at 650-51. The EEOC's attempt to use general population statistics illustrates the rationale underlying *Wards Cove*, which is that an employer should not be held liable for disparities that are not caused by its employment practices. *Id.* at 651 (refusing to hold employer liable for disparities caused by "reasons that are not [the employer's] fault"). The EEOC focused on general background statistics such as arrest and incarceration rates, and the racial disparity in those with "good" or "bad" credit histories. *E.g.* ECF No. 121 at 15-16; ECF No. 186-14 at 23. But Freeman was not generally concerned about arrests at all, and was not concerned about all convictions, or about whether those convictions led to incarceration. Instead, Freeman was concerned about only particular types of convictions. Similarly, Freeman was not concerned about whether an applicant had "good" or "bad" credit. Rather, Freeman was concerned about only certain indicators of bad credit. The EEOC failed to produce any general population statistics that approximated the criteria used by Freeman to make hiring decisions. The use of general population statistics also failed to take into account the subjective component of Freeman's policy, which gave employees who failed a background check an opportunity to explain the circumstances before Freeman denied them a position. ECF No. 108-4 at 15. And, indeed, the EEOC should have been aware that any reliance on general population statistics would be flawed, since population statistics demonstrated adverse outcomes for Hispanics generally, yet its expert failed to find a statistically significant disparate impact on Hispanics from Freeman's specific use of background checks. *Freeman*, 961 F. Supp. 2d at 798-99.

Even if general population statistics were appropriately tailored in this case, the EEOC overlooks a key issue, which is noted in the cases cited by the EEOC, yet ignored by it: in order to use general population statistics that do not match the particular employment criteria instead of statistics from the employer, the missing statistics must be impossible or extremely difficult to obtain.  *See Carpenter*, 456 F.3d at 1199 (noting, in excluding statistics that were insufficiently tailored, that "Plaintiffs have not established that the data necessary to establish the impact on CBA-qualified workers were unavailable"); *Peightal*, 56 F.3d at 1556n.17 (noting that district court properly included undifferentiated statistics where "no differentiated population statistics exist based upon the level of education of minorities"); *see also Wards Cove*, 490 U.S. at 651 ("Alternatively, in cases where such labor market statistics *will be difficiult if not impossible to ascertain*, we have recognized that certain other statistics…are equally probative for this purpose.").[10]

Here, it was not impossible for the EEOC to obtain the relevant data from Freeman that it needed to do the appropriate statistical analysis.  The data necessary to determine the impact of Freeman's use of background checks was available, because it was provided by Freeman in discovery.  *Freeman*, 961 F. Supp. 2d at 793 (noting that Freeman "clearly demonstrated that it properly supplied the EEOC during discovery with complete background check logs for the entire period covered by the complaint."); *Freeman*, 778 F.3d at 469 (Agee, J., concurring)

---

[10] The Fourth Circuit's 1990 decision in *Thomas v. Washington Cty. Sch. Bd.*, 915 F.2d 922 (4th Cir. 1990), cited by the EEOC, is to the same effect.  In *Thomas*, the Fourth Circuit determined that a plaintiff teacher had, through extensive anecdotal evidence documenting the effect of the defendant school board's nepotistic and word-of-mouth hiring practices on black candidates, proved that those practices had an unlawful disparate impact on blacks, notwithstanding that she "did not offer sufficient statistical evidence to prove discrimination." *Id.* at 926.  However, the Fourth Circuit noted that the plaintiff could not produce such statistical proof because the school board's policies, along with insufficient data on the number of qualified applicants, "made the database inadequate for statistical purposes." *Id. Thomas* simply proves the point that appears to have consistently escaped the EEOC: that alternatives to specific statistical evidence are not, and never have been, intended to aid the plaintiff whose expert does shoddy work, but rather to aid the plaintiff who cannot obtain the data necessary to perform the specific statistical analysis that would otherwise be required.

(same).   Accordingly, the EEOC could not have reasonably hoped to rely on general population statistics in the event that its flawed expert reports were excluded, because it could not have possibly demonstrated that the relevant data was unavailable.

The upshot, then, is that the EEOC could not reasonably pursue its claims unless it could produce an arguably reliable expert report with statistics showing a disparate impact caused by Freeman's particular employment practices.   As explained in the next section, the EEOC wholly failed to do this.

### B. It was Unreasonable for the EEOC to Continue to Litigate on the Basis of Obviously Flawed Expert Reports

As made clear in the opinions of this Court and the Fourth Circuit, Murphy's report was severely flawed.   His conclusions were drawn from an unrepresentative sample, even though data was available from which a representative sample could be drawn.   *Freeman*, 961 F. Supp. 2d at 793-94.   He excluded data from much of the relevant time period, and excluded data from most of Freeman's branches.   *Id.* at 794-96.   He cherry-picked data.   *Id.* at 795.   Worse yet , his reports contained a "mind-boggling number of errors," most of which were introduced by Murphy.   *Id.* at 796.   The question is not whether Murphy's reports were flawed, because they clearly were.   The question is if they were so flawed that it was unreasonable for the EEOC to litigate in reliance on them.

### 1. The EEOC should have been aware of the unreliability of Murphy's analysis no later than after Freeman's motion to exclude was filed

Freeman's motion to exclude Murphy's expert report revealed the alarming number of flaws in his report, without which the EEOC had no case.   That motion detailed flaws on the face of the report, flaws with the data set used in the report, and multiple material errors in the report.   ECF No. 108-1.   Given those deep and obvious flaws, the EEOC could not possibly continue to

rely on Murphy's initial report, which is likely why the EEOC had Murphy submit yet another report, which still had many of the same flaws as the original report.

It is difficult to read the opinions this case has generated, in this Court and in the Fourth Circuit, and come away with any notion that the EEOC had any reasonable basis to rely on Murphy's reports. This Court described Murphy's analysis as "completely unreliable," noted the "plethora of errors and analytical fallacies," and called his attempt to correct his analysis "laughable." *Freeman*, 961 F. Supp. 2d at 793, 796. All three judges on the Fourth Circuit's panel agreed, noting the "sheer number of mistakes and omissions in Murphy's analysis," and characterizing these errors as "troubling." *Freeman*, 778 F.3d at 466-67. Judge Agee wrote a concurring opinion for the sole purpose of chastising the EEOC for its "disappointing litigation conduct," based primarily on the EEOC's reliance on Murphy's shoddy work. *Id.* at 468. In Judge Agee's opinion, it "was not a close question." *Id.* Finally, Judge Agee expressed concern that the EEOC continued defending Murphy's work despite Murphy's storied history of having similarly flawed analysis excluded and sharply criticized by other federal courts. *Id.* at 468-71.

All of which is to say, no set of objective eyes has yet looked at Murphy's work and considered it anything but inexcusably slipshod and wholly unreliable. The Court recognizes that exclusion of evidence does not always mean that a defendant is entitled to attorneys' fees. But this is not a case where a questionable or novel scientific method was challenged and an expert was excluded on that basis in a close case, or where an expert's understandable failure to cross a few "t's" and dot a few "i's" necessitated exclusion. This was not close and it was not excusable. This was a case where an expert employed no method whatsoever (except to disingenuously cherry pick data), and seemed to go out of his way to introduce errors into his analysis. These flaws were especially concerning because the relatively small number of

background check failures meant that even a small number of errors could cause large changes to the analysis.  The EEOC argues that it was not "required to basically reconstruct Dr. Murphy's database" to avoid being liable for attorneys' fees.  ECF No. 191 at 22.  That may be true, but Freeman *did* basically reconstruct the database.  Once Freeman had done this work, and detailed the multitude of flaws it discovered as a result, the EEOC was aware of those flaws, or should have been.  Accordingly, Freeman is entitled to attorneys' fees from the date it filed its motion to exclude.[11]

### 2.  Murphy's supplemental reports were flawed

Although the EEOC defended Murphy's initial report, it also submitted a series of supplemental reports in an attempt to stave off exclusion and preclude summary judgment.  ECF No. 121-1.  Freeman and the EEOC dispute whether it was reasonable for the EEOC to believe it could supplement Murphy's report.   That argument is moot, however, if the supplemental reports could not save Murphy's analysis, which is the case here.  As Freeman demonstrated, Murphy's first supplemental report suffered from many of the same flaws as his initial report.  Murphy claimed to augment his analysis to include more background checks from the relevant time period and from branches not covered in his initial analysis.  *Id.* at 14.  While this was true, a review of the data Murphy used shows that he still did not attempt to construct a representative sample, but yet again simply included data in his sample without any regard for whether that data fairly represented the population he was studying.  For example, Murphy's new

---

[11] Freeman seeks attorneys' fees from the date the EEOC *served* Murphy's report on Freeman, arguing that the report contained enough facial flaws that it was unreasonable to even serve it on Freeman.  It is certainly true that Murphy's initial report was significantly flawed on its face, even without digging into the data.  However, the Court is at least somewhat persuaded by the EEOC's argument that it should not have been required to wholly reconstruct Murphy's data set to avoid attorneys' fees.  It is a close question, but considering all of the circumstances of this case, the Court will not award attorneys' fees from the date Freeman served Murphy's report on Freeman.  As a result, the total fee will be reduced by $388,768.50, reflecting the fees incurred prior to December 18, 2012.  These fees are reflected in the following entries in ECF No. 193-6: entries 1-7, entry 9, entries from pages 4-7 (ending at entry 73), all entries from pages 8-22, entries from pages 26-111 (ending at entry 699), and entries 1067-1081.

data set, while it included data from all of Freeman's branches, underrepresented the number of background checks performed at some branches and overrepresented the number of background checks performed at others. *E.g.* ECF No. 130-1 at 12. And Murphy failed again to use all of the discovery materials available to him to construct a more complete sample. *Id.* at 11. Finally, his supplemental report *still* contained an unreasonably large number of errors.[12]  *Freeman*, 961 F. Supp. 2d at 796 ("Murphy once again managed to introduce fresh errors into his new analysis").

The EEOC attempted to supplement Murphy's report yet again, with a declaration by Murphy served on Freeman a month after briefing closed, and proffered to the Court at the hearing on Freeman's motions. ECF No. 177-1. Amazingly, the EEOC attempts to rely on this report even now to demonstrate that its case was not factually groundless because the findings in *that* last minute report "have not been rebutted." ECF No. 191 at 7. That may be true, but rebutting that report has never been Freeman's obligation. After having conclusively shown how deeply flawed *two* of Murphy's reports were, Freeman was under no obligation to undertake yet another analysis of a last-ditch report produced well after briefing on its motions had closed.[13]  It makes little sense to allow the EEOC to avoid paying attorneys' fees because it threw a Hail

---

[12] Even if the EEOC was not required to reconstruct Murphy's data set based on the original report, it should have done much more to ensure Murphy's attempted supplements actually were arguably reliable once it became aware of the inexplicably shoddy work in Murphy's first report.

[13] Although Freeman has not done a full rebuttal of Murphy's final report, it does contend that this report continues to omit all of the data from 2009, and that the EEOC conceded that point at the motions hearing. ECF No. 186 at 25. While the EEOC takes exception to the assertion that it conceded the point, ECF No. 191 at 7n.2, it does not directly refute the assertion that Murphy's report continued to exclude data from 2009.

Mary well after time had expired.[14]   To do so would encourage unreasonable litigation conduct, by incentivizing parties to file report after report, after it has become clear multiple times that an expert cannot produce a reliable analysis, in hopes that some untimely report remains unrebutted and, although not admitted during the merits phase, could yet be relied upon during the fee phase with the only fact in support of the report that no one had yet countered it.   The Court will not allow that here.

Moreover, there is absolutely no reason to take Murphy at his word that his third attempt at doing a passable statistical analysis was any better than his first two attempts.   In this regard, Murphy's first supplemental report was accompanied by a declaration which he swore "under penalty of perjury" was "true and correct to the best of my knowledge."   ECF No. 121-1 at 24. Yet, that declaration contained a number of blatant falsehoods.   For example, Murphy claimed that any errors in his original report originated in Freeman's data.   ECF No. 121-1 at 5.   Yet, in most cases this was not true.   *Freeman*, 961 F. Supp. 2d at 796n.7.   Murphy also claimed that he had removed pre-July 20, 2006 credit check analysis from his data, but he had not.   *Id.* at 796. Given Murphy's apparently cavalier attitude towards submitting sworn declarations, there is no reason to assume that Murphy's second sworn declaration was any better than his first.   Thus, even if the EEOC reasonably believed it could supplement its reports, it could not have

---

[14] While it was arguably reasonable for the EEOC to expect it could supplement Murphy's analysis once, it was unreasonable to think it could supplement it yet a third time, and to expect it could do so by filing a surreply. Murphy's third analysis was not based on any new facts, as required to supplement a report, but was simply a response to criticisms raised by Freeman in response to Murphy's supplemental report.   And even though expert discovery was currently stayed, the EEOC's deadline for submitting expert reports had long since passed, so the report was plainly untimely.   Allowing the third report would have prejudiced Freeman, as it had already filed a motion to exclude and a motion for summary judgment based on the initial report filed nearly a year earlier.   *See Freeman*, 961 F. Supp. 2d at 797-98 (explaining why Murphy's supplemental reports are inadmissible).

reasonably continued to litigate based on supplements that had the same flaws as Murphy's initial report.[15]

The EEOC did not face a high burden to avoid paying Freeman's reasonable attorneys' fees. It only needed to do what is expected of all litigants: to litigate reasonably. Relying on evidence as severely and obviously flawed as Murphy's reports, without which the EEOC had no case, was clearly unreasonable. As a result, Freeman is entitled to its reasonable attorneys' fees

### III.    The Reasonableness of the Fee Request

To determine the reasonableness of a fee request, courts calculate a lodestar figure by multiplying the number of reasonable hours expended by a reasonable rate. *Robinson v. Equifax Info. Svcs., LLC*, 560 F.3d 235, 244 (4th Cir. 2009). The factors to be considered in determining reasonableness are:

> (1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases.

*Id.* at 243-44.

### A.  The Hourly Rates Sought by Freeman are Generally Reasonable

The fee applicant bears the burden of establishing the reasonableness of a requested hourly rate. *Plyler v. Evatt*, 902 F.2d 273, 277 (4th Cir. 1990). "In addition to the attorney's own affidavits, the fee applicant must produce satisfactory specific evidence of the prevailing market

---

[15] The EEOC argues vigorously that its appeal was reasonable. To be sure, its appeal involved several non-frivolous issues, including issues of first impression in the Fourth Circuit. However, just as the inability to produce reliable expert testimony was fatal to its claim in this Court, so was that failure fatal to its appeal. Even if the EEOC had the better of every other argument on appeal, its lack of reliable expert testimony ensured those arguments would never be reached. Thus, the EEOC's entire appeal was unreasonable even if it presented several non-frivolous arguments.

rates in the relevant community for the type of work for which he seeks an award." *Id.* (internal quotation marks omitted). Evidence sufficient to verify the prevailing market rate "include affidavits of local lawyers familiar with the type of work involved, the relevant community, and the skills of the fee applicants." *Life Tech. Corp. v. Life Tech., Corp.*, 2012 WL 4748080, at *1 (October 2, 2012). Appendix B of the Local Rules for the District of Maryland sets forth presumptively reasonable rates, but these guidelines are non-binding. Freeman seeks the following above-guidelines hourly rates for its attorneys, paralegals, and other litigation support staff:

- Donald Livingston (admitted to bar for 20+ years) - $545 ($70 above guidelines)
- W. Randolph Teslik (admitted to bar for 20+ years) - $480 ($5 above guidelines)
- Hyland Hunt (admitted to bar for 5 years) - $480 ($180 above guidelines)
- John T. Koerner (admitted to bar for 1 year) - $290 ($65 above guidelines)
- Amy H. Glad (admitted to bar for 1 year) - $290 ($65 above guidelines)
- Paralegals - $155 ($5 above guidelines)
- Litigation support staff - $155

ECF No. 186-1 at 5-6.

With the exception of Hyland Hunt, more fully discussed below, these rates are reasonable. The EEOC argues that these rates are unreasonable because "Defendant and its witnesses have failed to identify what the prevailing rates (or range of rates) are in this legal market or what facts they are relying on to reach that conclusion [that the rates are reasonable.]" ECF No. 191 at 52. However, affidavits of local lawyers are sufficient evidence to show the prevailing market rates. *Life Tech. Corp.*, 2012 WL 4748080 at *1. Freeman has presented two such affidavits attesting to the reasonableness of the fees it seeks. ECF No. 186-10 (affidavit of Russell H. Gardner); ECF No. 186-11 (affidavit of Eric Hemmendinger). These are sufficient to establish prevailing market rates for similar matters, and the EEOC presents no rebuttal evidence.

This case involved a complex legal question with potentially serious ramifications for Freeman's business interests.  Not only was Freeman facing over $3 million in liability in this lawsuit, but also its ability to control the quality of its applicant pool was threatened, which could have realistically led to such negative consequences as more frequent incidents of embezzlement and fraud, workplace violence, and exposure to negligent hiring claims.  Also, the EEOC had made challenging background checks a priority, indicating that the litigation could be particularly difficult.  Finally, Freeman's attorneys had a high level of skill and expertise commensurate with their experience.  In light of all of these factors, the slightly above-guidelines rates requested by Freeman are reasonable.  *Life Technologies*, 2012 WL 4748080 at *2 (awarding above-guidelines fees for complex matter involving highly skilled attorneys).

However, a rate of $480 for Hyland Hunt, who was admitted to the bar for only five years when the appeal in this case began, is not reasonable.[16]  That is higher than the highest guidelines rate for attorneys admitted to the bar for more than 20 years, and is $180 higher than the guidelines rate for an attorney with similar experience.  In light of her qualifications, including having clerked at the Supreme Court and on the D.C. Circuit, however, an above-guidelines rate is still reasonable.  The Court will reduce her hourly rate to an above-guidelines rate of $380.  Applying an hourly rate of $380 to attorney Hunt's work on appeal and on the fee petition results in an across-the-board fee reduction of $17,270, from $82,896 to $65,626.[17]

---

[16] While Hyland Hunt was licensed in 2008, which would have given her one year of bar admission when this lawsuit began, she did not become involved until the appeal was filed in 2013.  The EEOC has not challenged her as belonging in the 5-8 years admitted bracket for purposes of the hourly rate guidelines.

[17] Hunt's total hours are reflected in entries 76, 83, 85, 87, 98, 99, 102, 105, 106, 109-111, 113, 114, 116, 118, 119, 121-123, 126, 131, 135, 138, 143, 145, 148, 151, 156, 159, 162, 173, 175, 177, 180, 182, 183, 193, 202, and 206 of ECF No. 193-7, and in entries 4, 12, 20, 22, 26, 27, 39, 42, 45, 46 and 48 in ECF No. 197-1.

### B.  Reasonableness of Attorney Hours

Once a reasonable hourly rate is determined, a reasonable number of hours must be determined.  "A prevailing party may not recover fees for excessive, redundant, or unnecessary hours."  *Id.*  Freeman's attorneys have exhaustively documented the hours spent on this litigation.  ECF No. 193-6 (hours spent in this Court); ECF No. 193-7 (hours spent on appeal); ECF No. 197-1 (hours spent defending fee petition).  The EEOC has just as exhaustively documented its objections to those hours.  ECF No. 191-4.  Instead of reviewing each item and objection line-by-line, the Court will review the EEOC's general objections, and indicate whether those objections have merit and warrant an across the board reduction in the fee award. *Chapman v. Ourisman Chevrolet Co.*, 2011 WL 2651867 ("[A]cross-the-board reductions are appropriate when billing records are voluminous and multiple billing entries are in dispute.") (quotation marks omitted).

### 1.  Work with amici

The EEOC objects to Freeman's entries reflecting its work with amici on appeal, constituting a total of $15,233 in attorneys' fees.[18]  ECF No. 191 at 34-35.  The EEOC cites *Rum Creek Coal Sales, Inc. v. Caperton*, 31 F.3d 169, 178, 181 (4th Cir. 1994) for the proposition that attorneys' fees a party incurs dealing with amici are not allowed in the Fourth Circuit.  The EEOC reads *Rum Creek's* holding too broadly.  In *Rum Creek*, the Fourth Circuit merely held that disallowing attorneys' fees related to amici "for clients who were *not prevailing parties*" was not an abuse of discretion.  *Id.* at 178 (emphasis added).  Freeman is a prevailing party.  *Rum Creek* thus provides little support for the EEOC's position, or guidance from the Fourth Circuit for this Court's exercise of discretion.  The Eleventh Circuit, however, has explicitly held that it is an abuse of discretion to allow attorneys' fees for work connected with amici, noting that "[a]n

---

[18] Freeman voluntarily withdrew $2,819 in attorneys' fees related to work with amici.

organization or group that files an amicus brief on the winning side is not entitled to attorney's fees and expenses as a prevailing party, because it is not a party.  We will not allow that result to be changed by the simple expedient of having counsel for a party do some or all of the amicus work."  *Glassroth v. Moore*, 347 F.3d 916, 918-19 (11th Cir. 2003).

Freeman responds with two unpublished district court opinions allowing fees for work dealing with amici.  *Riter v. Moss & Bloomberg, Ltd.*, 2000 WL 1433867, at *5 (N.D. Ill. Sept. 26, 2000) (holding that time spent coordinating with amici is "a reasonable use of time as it prevents duplication of the issues among the several briefs" and awarding fees); *Watson v. E.S. Sutton, Inc.*, 2007 WL 2245432, at *4 (S.D.N.Y. Aug. 3, 2007) ("[T]he time [plaintiff's] counsel spent reviewing and working with the EEOC on its appellate amicus curiae brief is recoverable.").  Except in the Eleventh Circuit, whether to allow attorneys' fees for time spent dealing with amici appears to be a matter committed to the sound discretion of the Court.

The Court does not see any value in a  rule that categorically excludes all attorneys' fees incurred dealing with amici.  Rather, whether time spent dealing with amici is reasonable turns on the degree to which amici could be reasonably helpful to the resolution of issues in a case.[19] Where the law is unsettled and evolving, the issues in a case are complex, or the impact of a case potentially widespread, amici presenting the positions of various interested non-parties could very well be helpful to the proper resolution of a case, and it is reasonable for attorneys to work

---

[19] The Court remains mindful, as always, that the hours spent dealing with amici must be reasonable and necessary, not duplicative and wasteful.  A party may not increase its fee award by having its attorneys essentially act as stand-in counsel for amici.  *Cf. Glassroth*, 347 F.3d at 919 (noting the danger that allowing award for work with amici could allow amici to get a fee award to which they are not entitled).  Rather, work with amici must be reasonably related to allowing the efficient presentation of issues, and the benefits of the work should benefit the client in some degree – counsel must not simply become counsel for amici as well.  Having reviewed Freeman's entries, the Court finds that the hours spent dealing with amici were reasonable.  Much of Freeman's work with amici involved recruiting  potential amicus parties (which would allow Freeman to present a show of strength for its position), editing and revising amicus briefs (ensuring that amicus briefs would have the maximum persuasive effect) and discussing strategic focus.  These are reasonable uses of time dealing with amici, and ultimately benefited Freeman.

with amici to ensure strong presentation of the issues.  By contrast, where the law is relatively well-settled, the issues simple, or the impact minor, the use of amici may simply be the sort of unreasonable piling up of fees for non-parties that the Eleventh Circuit feared, and attorneys need not spend extensive time working with amici to ensure proper presentation of relevant issues.

Here, the intersection between background checks and Title VII is an evolving area of the law, one in which the EEOC has taken a keen interest, and which has potentially far-reaching consequences for employers throughout the country.  Amici could reasonably have been expected to present various relevant arguments in support of Freeman's position to the Fourth Circuit to help it resolve the complex issues presented.  Thus, the Court will allow these fees to be recovered, in the amount of $14,303, which reflects Hyland Hunt's reduced hourly rate.[20]

## 2.  The PowerPoint Presentation

The EEOC objects to the hours spent by Freeman's legal team preparing a PowerPoint presentation for the motions hearing, hours that represent $42,629.50 of its fee request. ECF No. 191 at 32-33.  The EEOC cites *Firestine v. Parkview Health Systems, Inc.*, 374 F. Supp. 2d 658, 668 (N.D. Ind. 2005), where the district court disallowed half of the 74.7 hours related to preparation of a PowerPoint presentation used at a 2.5 day trial.[21]  However, in that case the district court noted that the non-prevailing party had prepared an equally detailed PowerPoint presentation in 5 hours, indicating that 74.7 hours was an unreasonable amount of time.  *Id.*  There is no similar evidence here that the time Freeman spent on its PowerPoint

---

[20] Hunt's work with amici is reflected in entries 123, 159, and 162 in ECF No. 193-7.

[21] The EEOC also states that "under 28 U.S.C. § 1920, production costs are not even recoverable for such slides absent court approval and demonstration that slides are necessary to such an understanding."  It then cites *Advance Bus. Sys. & Supply Co. v. SCM Corp.*, 287 F. Supp. 143, 164 (D. Md. 1968) and *Simmons v. O'Malley*, 235 F. Supp. 2d 442, 444 (D. Md. 2002), two cases interpreting 28 U.S.C. § 1920.  This is a baffling argument. 28 U.S.C. § 1920 has to do with taxing costs, not attorneys' fees.  The two cases cited by the EEOC concern copying fees.  That is not what is at issue here.

presentation was unreasonable.  Rather, distilling complex briefing and voluminous exhibits into a digestible summary is likely to be difficult and time-consuming.  Much time and thought must go towards selecting the most important points and highlighting the most important pieces of evidence.  Freeman has voluntarily reduced the amount sought for preparing its PowerPoint presentation by $10,000, to $32,629.50.  That is sufficient to alleviate any concerns about the reasonableness of these hours.

### 3.  Summary judgment briefing[22]

The EEOC objects to excessive hours spent on summary judgment briefing.  There are two aspects to the EEOC's argument.  First, to the extent Freeman repeated the same arguments in its summary judgment motion as it did in its motion to exclude, it argues that those efforts were duplicative and thus should be disallowed.  ECF No. 191 at 36-37.  Second, to the extent Freeman included any arguments in its summary judgment motion other than the EEOC's inability to show a disparate impact with statistical evidence, which was a dispositive issue, it contends that those arguments were unnecessary, and fees incurred presenting them should be disallowed.  *Id.* at 37-38.  The sum of these two arguments is that "a simple, two-page summary judgment motion filed after the *Daubert* motion was granted would have sufficed."  *Id.* at 38. This argument misses the mark.

Having filed a motion to exclude that would, if granted, have vitiated a necessary element of the EEOC's *prima facie* case of discrimination, Freeman understandably filed a motion for summary judgment.  But however confident Freeman may have been that the motion to exclude would succeed and thus would entitle it to summary judgment, it was not required to present *only* that ground as a basis for summary judgment, nor was it required to wait until after a ruling on its

---

[22] The bulk of fees related to summary judgment briefing are being disallowed simply because the Court is only awarding fees from the date Freeman filed its motion to exclude.  However, the Court will still address the EEOC's broader objections, because those objections also apply to the hours Freeman spent on its reply brief.

motion to exclude to move for summary judgment, especially where it had identified several alternative arguments supporting its request for summary judgment. "[T]here is  no requirement that counsel pursue potentially dispositive issues in a case in a piecemeal fashion, rather than presenting all potentially dispositive claims at one time in a properly filed motion for summary judgment." *Reeves v. United Parcel Service*, 2007 U.S. Dist. LEXIS 102332, at *16-17 (D.S.C. July 20, 2007).   It was perfectly acceptable for Freeman to put forth every non-frivolous argument in its arsenal that would support summary judgment.  There were many good reasons to do so.  Freeman was not required to assume the Court would view the exclusion issue in the same way it did.  Rather, it was allowed to hedge its bets and make its motion for summary judgment as strong as possible.  Moreover, presenting multiple arguments supporting summary judgment allowed the Court to potentially rule in Freeman's favor on multiple alternative theories, which could bolster Freeman's chances of prevailing on appeal. *Christianburg* placed a relatively light burden on the EEOC to litigate reasonably.  It did not place a burden on Freeman to pull its punches in attempting to dispose of the case.

Nor was Freeman's motion for summary judgment so duplicative of the motion to exclude as to render the time spent on it unreasonable.   Freeman advanced a number of alternative, non-frivolous arguments unrelated to its motion to exclude, including that white males could not sustain a Title VII cause of action under a disparate impact theory, that it was entitled to summary judgment for male claimants who applied for jobs prior to May 31, 2008 because those claims were time-barred, and that it was entitled to summary judgment for claimants who lied about their criminal history on their employment application.  ECF No. 114-1 at 2.   Indeed, the bulk of the argument section of Freeman's summary judgment brief is dedicated to these alternative arguments. *Id.*  That the Court ultimately did not need to reach

24

these arguments does not justify reduction of the fee. *See Stark v. PPM America, Inc.*, 2003 WL 21223268, at *4 (N.D. Ill. May 23, 2003).  Therefore, Freeman will be allowed to recover the full amount of its fees incurred after December 18, 2012, for its summary judgment motion.

### 4.   Fees related to ancillary, unsuccessful, or unfiled motions

The EEOC objects to fees sought by Freeman in presenting its unsuccessful opposition to the EEOC's motion to stay briefing on Freeman's motion for attorneys' fees, its unsuccessful opposition to the EEOC's motion to supplement the record, and its non-opposition to the EEOC's motion to stay execution of costs pending appeal.[23]  ECF No. 191 at 39-41.

"Where a [party] has obtained excellent results, his attorney should recover a fully compensatory fee.  Normally this will encompass all hours reasonably expended on the litigation…In these circumstances, the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley*, 461 U.S. at 435. Freeman obtained excellent results.  The question is not necessarily whether individual motions were successful, or whether research into various courses of action resulted in a decision not to oppose a motion, but whether the hours spent on those issues "were expended in furtherance of the litigation of the case as a whole and centered on a common core of facts and related legal theories." *Durham v. Jones*, 2012 WL 3985224 at *8 (D. Md. Sept. 10, 2012).

In regards to Freeman's unsuccessful oppositions to the EEOC's motions to stay briefing on the motion for attorneys' fees and to supplement the record, neither of those oppositions appears to have been frivolous, so there is no justification for denying those fees outright.  *See Cross v. Fleet Reserve Ass'n Pension Plan*, 2010 WL 3609530, at *8 (D. Md. Sept. 14, 2010) (awarding fees for hours spent on unsuccessful motions where hours spent were reasonable and

---

[23] The EEOC also objects to Freeman's seeking fees for a non-filed motion to exclude certain claimants.  All work on that motion occurred before December 18, 2012, so the Court will not award any of those fees.

efforts were not "unreasonable or in bad faith."). In addition to the fact that these were not frivolous oppositions, they were necessitated by the fact that the EEOC had filed an unreasonable appeal. To categorically deny fees that would not have been expended but for the EEOC's frivolous appeal would make little sense. However, because these motions were unsuccessful, the Court will reduce the fees requested by 50%, reducing the fee award by $9,756.

The Court will allow in full the hours spent considering filing an opposition to the EEOC's motion to stay execution of costs, notwithstanding that it did not ultimately file an opposition. "A competent attorney will explore various theories and lines of argument, some of which may entail motions of one kind or another, but not all of which will – in the end – prove to be advisable courses of action." *Alfano v. CIGNA Life Ins. Co.*, 2009 WL 890626, at *4 (S.D.N.Y. Apr. 2, 2009). Freeman was not required to consent to a stay of execution of costs without spending time considering the effect of a stay and the viability of an opposition. Even though it ultimately decided to consent to that motion, it was not unreasonable to consider an alternative course and spend time researching the consequences of that course. The question is whether the hours that were spent were reasonable, and there is no indication that they were not.

### 5. Fees related to staffing at hearings

The EEOC objects to $3,840 for Teslik's attendance at the motions hearing, and $1,015 for Koerner's attendance, even though neither attorney offered argument. Generally, the guidelines allow recovery for the attendance of only one attorney at hearings. However, departure from this guideline is appropriate where there is a valid reason to have multiple attorneys attend a hearing. Here, the complexity of the case, the number of arguments presented, and the amount of evidence, justifies having one senior attorney who will handle the argument and one junior attorney present, who may have more familiarity with the evidence in the case and can assist in responding to unexpected arguments, which Freeman indicates was the case

26

here.  ECF No. 193 at 26-27  Thus, the Court will allow $1,015 for Koerner's attendance at the hearing.  However, there does not appear to be any justification for having a second partner attend the hearing who will not be arguing.  Thus, the Court will disallow $3,840 for Teslik's attendance.

### 6.  Fees related to the appeal

Freeman seeks $211,146 for 450 hours expended on the appeal.  ECF No. 193-7 at 43. The EEOC objects to many of the hours expended on appeal as "duplicative and excessive," because the issues on appeal were fully briefed before this Court.  ECF No. 191 at 51-52.  While it is true that the legal issues presented on appeal were the same as those briefed in this Court, that does not necessarily make the number of hours expended on appeal excessive.  District court proceedings and appellate proceedings are different.  Although, in the most general manner, the facts and legal arguments are the same, presenting a persuasive appeal requires much more than simply reformatting the briefs presented to the district court to conform with the style requirements of the appellate court, and 450 hours is not an unreasonable amount of time to research and prepare proper arguments to present on appeal.

The EEOC cites *Goodwin v. Metts*, 973 F.2d 378 (4th Cir. 1992) and *Spell v. McDaniel*, 852 F.2d 762 (4th Cir. 1988) for the proposition that courts have reduced fees sought for appellate work where that work was duplicative and unnecessary in light of previous work done on the case in district court.  While that argument is true as far as it goes, an examination of those cases shows that they do not support the EEOC's position that the fees Freeman seeks reflect work that is duplicative and unnecessary.  In *Goodwin*, the prevailing party sought compensation for 640 hours of appellate work, 190 hours *more* than Freeman is seeking, and the Fourth Circuit affirmed the district court's reduction of those hours by 50% to 320 hours, 130 hours less than

Freeman is seeking.  *Goodwin*, 973 F.2d at 380, 385.  In *Spell*, the Fourth Circuit affirmed a reduction in hours sought for appellate work from 1,431.1 hours to 420 hours, only 30 hours less than Freeman is seeking here.  *Spell*, 852 F.2d at 767-768.  *Goodwin* and *Spell* do stand for the proposition that a reduction in a fee award is warranted where appellate counsel largely duplicate the efforts of trial counsel.  However, they do not stand for the proposition that 450 hours represents such a duplication of effort.  If anything, *Spell* indicates that an award of 450 hours is well within the discretion of the Court to allow.  Given the complexity of the legal issues presented on appeal, several of which were issues of first impression in the Fourth Circuit, 450 hours is reasonable, and the Court will not disallow any of the hours Freeman spent on the appeal.[24]

### 7.   Fees for preparing the fee petition

As supplemented, *see* ECF No. 197, Freeman seeks $164,713.50 in fees for time spent preparing its fee petition. The EEOC objects that this is "plainly unreasonable" because the motion "simply recaps prior arguments and various rulings by the Court."  ECF No. 191 at 42. The Court disagrees.  As noted above, with regards to recovering attorneys' fees, the prevailing Title VII defendant is in a different position than the prevailing Title VII plaintiff.   The prevailing plaintiff generally needs to show only that he or she won.  By contrast, the prevailing defendant needs to show that the lawsuit was frivolous or unreasonable, a much more demanding standard.

Thus, at the merits phase of this case, Freeman won so long as it was right.  To be entitled to attorneys' fees, it must show not only that it was right, but that it was *so* right that the EEOC's continuation of the litigation was unreasonable.  If the EEOC can cite *any* authority whatsoever

---

[24] As reflected above, the total fee sought for appeal will be reduced slightly as a result of Hunt's reduced hourly rate.

to support the positions it put forth in the merits phase – and it has tried – Freeman is not entitled

to recover its attorneys' fees.  That it would need to spend a significant number of hours ensuring

it could credibly argue that the EEOC's positions were meritless is not surprising.  Moreover, the

EEOC lodged over 1,000 objections to Freeman's fee request, ECF No. 191-4, which Freeman

had to address in its reply.[25]   The EEOC can hardly complain about the time Freeman spent

replying to its petition when it has litigated the fee phase as hard as it litigated the merits phase.

The fees sought for preparation of the fee petition represent approximately 12% of the total fees

sought for the merits phase.  The Court finds that is reasonable.  *See Trimper v. City of Norfolk*,

58 F.3d 68, 77 (4th Cir. 1995) (upholding award of fees spent on fee petition that amounted to

20% of fees incurred in merits phase).  Thus, the Court will not disallow any hours spent on the

fee petition (although the total awarded for preparing the fee petition will be reduced slightly due

to the reduction in Hunt's rate, as noted above).

### C.  Reasonableness of Expert Fees

In addition to attorneys' fees, Freeman is seeking the following in experts' fees:

- Dr. Donald Deere - $387 an hour
- Dr. Mary Dunn Baker - $430 an hour

The EEOC objects to these fees on various grounds.[26]

### 1.  Dr. Donald Deere

Freeman seeks recovery of $223,455 incurred by Donald Deere for 584.8 hours of work,

primarily related to analyzing the data used by Murphy to support his conclusions.

ECF No. 186-1 at 6.  The EEOC objects to this amount.

---

[25] Freeman obviously reviewed the EEOC's numerous objections in some detail, as it voluntarily withdrew $145,260.50 from its fee request based on those objections.  ECF No. 193 at 8.
[26] Freeman requests $88,000 in fees paid to Dr. James Outtz.  ECF No. 186-1 at 7.  All of Dr. Outtz's work came before Freeman filed its motion to exclude.  ECF No. 186-6.  Since the Court is not awarding fees before that date, none of Dr. Outtz's fees will be awarded.

The first basis for this objection is that Freeman previously represented to the Court that Freeman employee Suzanne Bragg conducted the analysis necessary to reveal the plethora of errors in Murphy's reports, yet now claims that it used expert Dr. Deere to conduct that analysis. ECF No. 191 at 44-45.  Thus, it argues that Freeman should be estopped from recouping the fees it spent on a "hidden expert" who actually performed the work where it misrepresented to the Court the true source of that work.  *Id*.  However, Bragg's declaration does not state that she, and *only* she, conducted the analysis necessary to reveal the errors in Murphy's data set.  It states that this analysis was conducted under her direction, and states that she reviewed the data and noted the errors therein.  ECF No. 108-15.  It is not inconsistent that she could have done this, aided by consultation with an expert, and her declaration is not a misrepresentation simply because of such consultation.  Moreover, the EEOC points to no authority that would indicate that Freeman's failure to disclose Dr. Deere's contribution to Bragg's analysis was improper.

The EEOC's second basis for objection is that Freeman had no need to retain an expert to review Murphy's report when the flaws of the report were, according to Freeman, so obvious that continuing to litigate on the basis of that report was unreasonable.  ECF No. 191 at 45-46. This argument is a red herring.  Murphy's report was facially flawed in obvious ways.  It was also flawed in less obvious ways, as Freeman discovered when it conducted a deep dive into the data.  Freeman was not required to rely solely on the obvious facial flaws to support its motion to exclude Murphy's report.  It was reasonable to engage experts to expose in detail just how flawed Murphy's report was.  Freeman cannot be faulted for litigating hard just because the EEOC litigated unreasonably.

The EEOC also argues that Freeman has not submitted evidence of the reasonableness of the rate charged by Dr. Deere.  Id. at 46.  However, Freeman submitted a declaration by

Donald R. Livingston indicating not only that the rates charged by Dr. Deere were reasonable, but also that those were the rates actually charged to Freeman. ECF No. 186-1 at 7-8. This is sufficient evidence to demonstrate the reasonableness of Dr. Deere's rates. *Cf. Life Technologies Corp.*, 2012 WL 4748080 at *1 (noting that "evidence of what the prevailing party's attorney actually charged the client in the case at hand" is sufficient to demonstrate reasonableness of rates). The EEOC does not rebut this evidence.

Although the Court finds that the EEOC's objections are without merit, the award for Dr. Deere's work will be reduced by $126,875 to $96,580, which reflects the amount of work done before Freeman filed its motion to exclude.

### 2. Dr. Mary Baker

Freeman seeks $11,124.50 in fees paid to expert Dr. Mary Baker, but only $643.50 survives the Court's decision to award only those fees incurred after Freeman filed its motion to exclude. Nevertheless, the Court assumes the EEOC would maintain its objections and will consider them.

The EEOC objects that Dr. Baker's work was duplicative of Dr. Deere's work. ECF No. 191 at 47-48. It does appear that much of Dr. Baker's work consisted of confirming Dr. Deere's work. However, that is reflected by the fact that Freeman is only seeking to recover $11,124.50 for Dr. Baker's work – and is only recovering $643.50 – compared to $223,455 for Dr. Deere. It was reasonable for Freeman to have a second expert confirming the complex work undertaken by another expert.[27]

The EEOC also objects to several of Dr. Baker's billing entries such as "review documents" and "literature review and research" as impermissibly vague. ECF No. 191 at 47. Vague as they are, Dr. Baker's declaration, submitted with Freeman's motion to exclude,

---

[27] The Court also notes that the EEOC retained a second expert to confirm Murphy's analysis.

provided detail about what documents she reviewed and what literature she consulted. ECF No. 108-28.   This is sufficient information to allow an award of fees.   *EEOC v. Peoplemark, Inc.*, 732 F.3d 584, 595 (6th Cir. 2013) (upholding award of expert's fees where expert's bill included entries such as "research" and "document preparation").

### IV.    The Final Fee Award

The Court must show its math.  Altogether, Freeman seeks a total of $1,583,762 in fees. That fee is being reduced as follows:

- $388,768.50, reflecting attorneys' fees incurred between July 18, 2012, and December 18, 2012.  *See supra*, Section II.B.1;

- $225,356, reflecting experts' fees incurred between July 18, 2012 and December 18, 2012 ($126,875 for Dr. Deere, $10,481 for Dr. Baker, and $88,000 for Dr. Outtz). *See supra*, Section III.C;

- $17,270, reflecting the reduction in Hunt's hourly rate from $480 per hour to $380 per hour (reducing total fees awarded for Hunt's work from $82,896 to $65,626).  *See supra*, Section III.A;

- $9,756, reflecting a 50% reduction in fees awarded for unsuccessful oppositions to the EECO's motions to stay briefing on Freeman's motion for attorneys' fees and to supplement the record.  *See supra*, Section III.B.4; and

- $3,840, reflecting the amount for Teslik's attendance at the motions hearing in this court.  *See supra*, Section III.B.5.

With those reductions taken into account, the total fee the Court will award to Freeman is $938,771.50.

**CONCLUSION**

The EEOC needed to stop pursuing this case after Freeman showed that the EEOC's dog did not hunt.  Once Freeman filed its motion to exclude, it should have been obvious to the EEOC that its dog had a variety of debilitating infirmities.  The hunt was lost.  Instead, the EEOC continued pursuing a lost cause.  As a result, Freeman is entitled to its reasonable attorneys' fees.  By separate Order, the Court will award Freeman $938,771.50 in attorneys' fees.


Date: <u>September 3, 2015</u>                                 <u>            /s/            </u>
                                                                        ROGER W. TITUS
                                                                        UNITED STATES DISTRICT JUDGE